**No. 23-16022**

---

### IN THE UNITED STATES COURT OF APPEALS
### FOR THE NINTH CIRCUIT

---

Kari Lake; Mark Finchem,

Plaintiffs,

and

Andrew D. Parker; Parker Daniels Kibort, LLC; Kurt B. Olsen; Olsen Law, PC,
Counsel for Plaintiffs,

*Appellants*,

v.

Bill Gates, as a member of the Maricopa County Board of Supervisors; Clint
Hickman, as a member of the Maricopa County Board of Supervisors; Jack
Sellers, as a member of the Maricopa County Board of Supervisors; Thomas
Galvin, as a member of the Maricopa County Board of Supervisors; and Steve
Gallardo, as a member of the Maricopa County Board of Supervisors;

*Defendants – Appellees*,

and

Adrian Fontes, Arizona Secretary of State; Maricopa County Board of
Supervisors; Rex Scott, as a member of the Pima County Board of Supervisors;
Matt Heinz, as a member of the Pima County Board of Supervisors; Sharon
Bronson, as a member of the Pima County Board of Supervisors; Steve Christy, as
a member of the Pima County Board of Supervisors; Adelita Grijalva, as a
member of the Pima County Board of Supervisors; Pima County Board of
Supervisors,

*Defendants.*

On Appeal from the United States District Court
for the District of Arizona
No. 22-cv-00677-JJT
Hon. John J. Tuchi

## APPELLANTS' BRIEF

Andrew D. Parker
(AZ Bar No. 028314)
Parker Daniels Kibort LLC
888 Colwell Building
123 N. Third Street
Minneapolis, MN 55401
(612) 355-4100
parker@parkerdk.com

*Attorney for Appellants*

Kurt Olsen
(D.C. Bar No. 445279)
Olsen Law, P.C.
1250 Connecticut Ave., NW
Suite 700
Washington, DC 20036
(202) 408-7025
ko@olsenlawpc.com

*Attorney for Appellants*

## **RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1(a), the undersigned certifies as follows: Olsen Law, P.C. has no parent corporation and no publicly held corporation owns 10% or more of its stock.

*/s/ Kurt Olsen*
Kurt Olsen

# TABLE OF CONTENTS

Table of Contents.................................................................. iii

Table of Authorities ............................................................. iv

I.  Rule 28(a)(4) Jurisdictional Statement.......................................1

II.  Issues Presented for Review.................................................2

III.  Circuit Rule 28-2.2 Statement of Jurisdiction ..............................4

IV.  Statement of the Case .....................................................5

V.  Summary of the Argument ...................................................10

VI.  Argument .................................................................13

  A. No Basis Exists to Impose Rule 11 Sanctions……………………………16

  1.  The Amended Complaint Satisfies Rule 11 Because It States Claims with
  Legal and Evidentiary Support. .................................................17

  2.  The Sanctions Order's Rule 11 Conclusion Misapplies the Law and
  Relies Upon Clearly Erroneous Factual Determinations. ............................29

      a. The Attorneys Did Not Fail to Conduct a Reasonable Pre-Filing
      Inquiry……………………………………………………………..29

      b. Plaintiffs' Claims Were Not Based on Speculation and Conjecture
      ………………………………………………………………..31

      c.  The District Court Misconstrued the Amended Complaint
      Concerning Arizona's Use of Paper Ballots, and Sanctioned the
      Attorneys for Purported Misrepresentations That Were Never Made
      ………………………………………………………………..43

      d. The District Court Wrongly Held the Allegations Concerning
      Testing of Arizona's Electronic Voting System Were
      False……………………………………………………………57

  B. No Basis Exists to Impose Sanctions Under 28 U.S.C. § 1927…………60

VII.  Conclusion................................................................63

VIII.  Statement of Related Cases ...............................................64

# TABLE OF AUTHORITIES

*Ackerman v. Pilipiak*,
    457 B.R. 191 (E.D.N.Y. 2011) .......................................................... 46

*Ault v. Hustler Magazine*,
    860 F.2d 877 (9th Cir. 1988) ............................................................ 34

*Baker v. Carr*,
    369 U.S. 186 (1962) ......................................................................... 18

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ......................................................................... 18

*Carson v. Simon*
    978 F.3d 1051 (8th Cir. 2005) ................................................ 1,19, 39

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
    408 F.3d 1349 (11th Cir. 2005) ....................................................... 39

*Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*,
    710 F.3d 946 (9th Cir. 2013) ........................................................... 45

*Common Cause Ind. v. Lawson, No.: 1:20-cv-01825-RLY-TAB*,
    2020 U.S. Dist. LEXIS 247756 (S.D. Ind. Oct. 9, 2020) ................. 62

*Cooter & Gell v. Hartmarx Corp.*,
    496 U.S. 384 (1990) .......................................................... 2, 3, 4, 15

*Curling v. Kemp*,
    334 F. Supp. 3d 1303 (N.D. Ga. 2018) ..................................... 18, 41

*Curling v. Raffensperger*,
    493 F. Supp. 3d 1264 (N.D. Ga. 2020) ..................................... 43, 54

*Election Integrity Project Cal., Inc. v. Weber, No. 21-56061*,
    2022 U.S. App. LEXIS 30549 (9th Cir. Nov. 3, 2022) .................... 33

*Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*,
    69 F.4th 665 (9th Cir. 2023) ........................................................... 45

*FEC v. Akins*,
    524 U.S. 11 (1998) ..................................................................... 18, 40

*Fed. Sav. & Loan Ins. Corp. v. Molinaro*,
   923 F.2d 736 (9th Cir. 1991) ............................................................ 15

*Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*,
   118 F. Supp. 3d 1338 (N.D. Ga. 2015) ............................................. 39

*Gaymar Indus. v. Cincinnati Sub-Zero Prods.*,
   790 F.3d 1369 (Fed. Cir. 2015) ........................................................ 46

*Gladstone, Realtors v. Bellwood*,
   441 U.S. 91 (1979) ........................................................................... 44

*Gray v. Sanders*,
   372 U.S. 368 (1963) .............................................................. 1, 18, 40

*King v. Whitmer*,
   71 F.4th 511 (6th Cir. 2023) ........................................ 30, 34, 38, 39

*Kiobel v. Millson*,
   592 F.3d 78 (2d. Cir. 2010) ............................................................. 46

*Lee v. POW Ent., No. 20-55928*,
   2021 U.S. App. LEXIS 35881 (9th Cir. Dec. 6, 2021) ..................... 16

*Lexington Ins. Co. v. Scott Homes Multifamily, Inc., No.: CV-12-02119-PHX-JAT*,
   2015 U.S. Dist. LEXIS 21205 (D. Ariz. Feb. 23, 2015) ................... 59

*Lozano v. Cabrera, No. 22-55273*,
   2021 U.S. App. LEXIS 35881 (9th Cir. Dec. 6, 2021) ................ 11, 16

*Lucas v. Duncan*,
   574 F.3d 772 (D.C. Cir. 2009) .................................................. 59, 60

*Mi Familia Vota v .Hobbs*,
   977 F.3d 948 (9th Cir. 2020) .................................................... 40, 61

*Montrose Chem. Corp. v. Am. Motorists Ins. Co.*,
   117 F.3d 1128 (9th Cir. 1997) ......................................................... 15

*Moore v. Keegan Mgmt. Co.*,
   78 F.3d 431 (9th Cir. 1996) ............................................... 4, 15, 60

*Nation v. DOI*,
   876 F.3d 1144 (9th Cir. 2017) ......................................................... 44

*Navarro-Ayala v. Hernandez-Colon,*
    3 F.3d 464 (1st Cir. 1993) .......................................................... 45, 46

*Obama for Am. v. Husted,*
    697 F.3d 423 (6th Cir. 2012) .......................................................... 39

*Ohio Republican Party v. Brunner,*
    544 F.3d 711 (6th Cir. 2008) .......................................................... 61

*Pavek v. Simon,*
    467 F. Supp. 3d 718 (D. Minn. 2020) ............................................. 41

*Purcell v. Gonzalez,*
    549 U.S. 1 (2006) ............................................................. 61, 62, 63

*Peterson v. Minidoka Cty. Sch. Dist. No. 331,*
    1997 U.S. App. LEXIS 36357 (9th Cir. July 8, 1997) ...................... 49

*Police Ret. Sys. v. Intuitive Surgical, Inc.,*
    759 F.3d 1051 (9th Cir. 2014) ........................................................ 44

*Reynolds v. Sims,*
    377 U.S. 533 (1964) ................................................................... 1, 18

*Rodick v. City of Schenectady,*
    1 F.3d 1341 (2d Cir. 1993) ............................................................ 35

*Sanchez v. Cegavske,*
    214 F. Supp. 3d 961 (D. Nev. 2016) ............................................... 39

*Self Advocacy Sol. N.D. v. Jaeger,*
    464 F. Supp. 3d 1039 (D.N.D. 2020) .............................................. 62

*Sierra Club v. United States EPA,*
    774 F.3d 383 (7th Cir. 2014) .......................................................... 33

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ....................................................................... 33

*Strom v. United States,*
    641 F.3d 1051 (9th Cir. 2011) ................................................... 10, 16

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ..................................................................... 32, 33

*Townsend v. Holman Consulting Corp.*,
    929 F.2d 1358 (9th Cir. 1990) ................................................ *passim*

*United Bank of Ariz. v. Sun Mesa Corp.*,
    119 F.R.D. 430 (D. Ariz. 1988) ....................................................... 35

*United Nat'l Ins. Co. v. R & D Latex Corp.*,
    242 F.3d 1102 (9th Cir. 2001) .......................................................... 6

*United States v. Classic*,
    313 U.S. 299 (1941) ....................................................................... 18

*United States v. Saylor*,
    322 U.S. 385 (1944) ....................................................................... 18

*Uy v. Bronx Mun. Hosp. Ctr.*,
    182 F.3d 152 (2d Cir. 1999) ............................................................ 59

*Walleri v. Fed. Home Loan Bank*,
    83 F.3d 1575 (9th Cir. 1996) ........................................................... 44

*Warren v. City of Carlsbad*,
    58 F.3d 439 (9th Cir. 1995) ...................................................... 15, 16

*Yates v. United States*,
    574 U.S. 528 (2015) ....................................................................... 45

*Young v. City of Providence*,
    404 F.3d 33 (1st Cir. 2005) ............................................................. 46

## Constitution and Statutes

28 U.S.C. § 1291 ................................................................................ 4

28 U.S.C. § 1927 ...................................................................... *passim*

28 U.S.C. §§ 1331 ............................................................................. 4

A.R.S. § 16-446 ............................................................................... 47

**Rules**

Fed. R. App. P. 3 ................................................................................. 1

Fed. R. App. P. 4 ............................................................................. 1, 5

Fed. R. Civ. P. 8 ........................................................................... 36, 38

Fed. R. Civ. P. 11 ...................................................................... *passim*

Fed. R. Civ. P. 12 ............................................................................. 13

Fed. R. App. P. 28 ......................................................................... 1, 4

## I.     RULE 28(a)(4) JURISDICTIONAL STATEMENT

(A)  The District Court had jurisdiction over the claims in the Amended Complaint because the claims were brought under federal law, seeking to enforce Plaintiffs' rights under the federal Constitution to vote and have their votes counted accurately in conjunction only with other legally cast votes. 28 U.S.C. §§ 1331, 1343; 42 U.S.C. § 1983; *FEC v. Akins*, 524 U.S. 11, 25 (1998); *Gray v. Sanders*, 372 U.S. 368, 380 (1963); *Reynolds v. Sims,* 377 U.S. 533, 556 (1964); *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020); *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020). Plaintiffs were residents of Arizona, registered voters, and candidates in the 2022 general election. 2-ER-267.

(B)  The Court of Appeals has jurisdiction over this appeal because appellant Attorneys timely filed a Notice of Appeal from the Order entered by the District Court on July 14, 2023, sanctioning them under Fed. R. Civ. P. 11 and 28 U.S.C. § 1927. 28 U.S.C. § 1291; Fed. R. App. P. 3(a)(1); Fed. R. App. P. 4(a)(1)(A). 3-ER-576.

(C)  The Order was filed on July 14, 2023, and the Notice of Appeal on July 19, 2023. 1-ER-2; 3-ER-576.

(D)  The appeal is from a final order that imposed sanctions following the judgment disposing of all parties' claims, entered on August 26, 2022. 2-ER-79-80; 3-

ER-592. On December 1, 2022, the District Court granted Appellees' motion for sanctions and ordered briefing concerning the amount. 1-ER-58. On July 14, 2023, the District Court entered an order that appellant Attorneys pay Appellees a sanction in the amount of $122,200. 1-ER-27.

## II.  ISSUES PRESENTED FOR REVIEW

1. Whether the District Court erred by holding that appellant Attorneys failed to conduct reasonable pre-filing inquiry before filing the Amended Complaint. 1-ER-51-53.

- This issue was raised in Plaintiffs' Opposition to the Maricopa Defendants' Motion for Sanctions. 2-ER-88-89.

- Review is for abuse of discretion, and a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

2. Whether the District Court erred by holding that the Amended Complaint pleaded sanctionable "Unsupported Claims Based on Speculation and Conjecture." 1-ER-47-51.

- This issue was raised in Plaintiffs' Opposition to the Maricopa Defendants' Motion for Sanctions. 2-ER-87-88, 97-98.

- Review is for abuse of discretion, and a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. *Cooter & Gell*, 496 U.S. at 405.

3. Whether the District Court erred by holding that the Amended Complaint falsely alleged Arizona does not use paper ballots in its elections. 1-ER-35-41.

- This issue was raised in Plaintiffs' Opposition to the Maricopa Defendants' Motion for Sanctions. 2-ER-89-91.

- Review is for abuse of discretion, and a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. *Cooter & Gell*, 496 U.S. at 405.

4. Whether the District Court erred by holding that the Amended Complaint falsely alleged that Arizona does not have objective, neutral, and expert testing processes for electronic voting machines. 1-ER-42-43.

- This issue was raised in Plaintiffs' Opposition to the Maricopa Defendants' Motion for Sanctions. 2-ER-91-92.

- Review is for abuse of discretion, and a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law

or on a clearly erroneous assessment of the evidence. *Cooter & Gell*, 496 U.S. at 405.

5. Whether the District Court erred by imposing sanctions pursuant to 28 U.S.C. § 1927. 1-ER-55-56.

- This issue was raised in Plaintiffs' Opposition to the Maricopa Defendants' Motion for Sanctions. 2-ER-98-99.

- Review is for abuse of discretion, and a district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence. *Moore v. Keegan Mgmt. Co.*, 78 F.3d 431, 435 (9th Cir. 1996); *Cooter & Gell*, 496 U.S. at 405.

## III.   CIRCUIT RULE 28-2.2 STATEMENT OF JURISDICTION

(A) The statutory basis of subject matter jurisdiction of the District Court is 28 U.S.C. §§ 1331 and 1343(a)(3).

(B) The order appealed from is final because judgment has already been entered, and the order is a post-judgment order imposing sanctions on counsel for a party. The statutory basis for this Court's jurisdiction to hear this appeal is 28 U.S.C. § 1291.

(C) The order appealed from was entered on July 14, 2023. 1-ER-2. The Notice of

Appeal was filed July 19, 2023. 3-ER-576. The Notice of Appeal is timely

pursuant to Fed. R. App. P. 4(a)(1)(A).

## IV.    STATEMENT OF THE CASE

Plaintiffs Kari Lake and Mark Finchem were candidates in Arizona's

November 2022 general election.[1] 2-ER-267. Prior to the election, they filed a

complaint, and later an Amended Complaint, 2-ER-260, alleging that Arizona will

use electronic voting systems ("EVS") to administer future elections, and that use of

these systems violates their federal constitutional rights because EVS can be

manipulated without detection to cause false vote tallies, resulting an election where

the outcome is not known to be correct and where the candidate who received fewer

votes can be named the winner. 2-ER-260-262, 303-306.

The Amended Complaint contains voluminous, detailed allegations showing

EVS are subject to manipulation and cannot be relied upon to provide secure, correct

vote tallies, and their flaws have been publicly reported and criticized for two

decades. 2-ER-270-271, 273-276 (¶¶ 59-61, 71-77). Computer scientists at

prominent universities and other experts have warned of and even demonstrated

---

[1] Lake is again a candidate in the 2024 election.

hacking techniques to manipulate votes reported by EVS. 2-ER-270-271, 276-278, 294-295 (¶¶ 61, 78-83, 139). United States Senators have warned of the vulnerability of EVS to manipulation and received a demonstration of EVS being hacked. 2-ER-283-285 (¶¶ 95-100). Processes billed as guarding EVS against security breaches, such as certification inspections, testing, and risk limiting audits, are inadequate and can be defeated. 2-ER-260-261, 265-266, 288, 295, 302 (¶¶ 2-3, 24, 31, 116, 144-45, 174).

The Amended Complaint pleads facts showing the threat of vote manipulation in EVS is not hypothetical. Those who want to manipulate U.S. elections exist; have actively worked to hack U.S. election-related computer systems in the past, sometimes successfully; and are firmly expected by knowledgeable individuals, including former federal government officials, to continue to hack EVS in future elections. 2-ER-277, 279, 282, 284-285 (¶¶ 79, 80, 84, 94, 98, 100-101). Instances of EVS misreporting vote tallies in actual elections have been observed. 2-ER-273-274 (¶¶ 73). In 2021, votes were omitted by an EVS in Tennessee due to unexplained "erroneous code" in the system. 2-ER-288 (¶ 116). In Georgia, thousands of votes were counted and certified through tabulation machines without corresponding ballot images. 2-ER-279 (¶ 85).

The Amended Complaint presented allegations and evidence showing a likelihood of EVS vote manipulation in Arizona. The Amended Complaint specifically targeted the "Dominion Democracy Suite 5.5b voting system" and the "ES&S ElectionWare 6.0.40 voting system" and their component parts, used by counties in Arizona. 2-ER-264-265, 272, 294 (¶¶ 14, 18-19, 23, 66, 68, 137-38). It alleged that Maricopa County's EVS after the 2020 election showed missing files, lost data, and inadequate cyber security. 2-ER-292 (¶ 132). It alleged that Arizona's post-election audit measures do not remediate the security problems inherent in its use of EVS. 2-ER-295-296 (¶¶ 144-151). It identified that an election-related computer system was hacked in Arizona in 2016. 2-ER-282 (¶ 94). Plaintiffs presented testimony from two cybersecurity professionals who, previously, had examined components of the Dominion EVS used by Maricopa County. One attested that the system suffered serious security deficiencies, showed evidence of remote anonymous log-ins, and could have its security procedures easily bypassed. 3-ER-340-349 (20:21-29:6, 29:14-21). The other testified that anyone who knew the shared password for the Maricopa County election management server had the capability to log in to the database and change voting results, 3-ER-406 (86:3-18), and that federal security certification standards for EVS, based on his observation of certified systems, would not meet "any cybersecurity standard that is established in

any other domain or any other industry of our country," did not ensure systems had all necessary security measures, and even required features that made systems vulnerable. 3-ER-382-383 (62:15-20, 63:3-21). He further testified that intrusions into EVS can occur without detection. 3-ER-404 (84:1-19).

The Amended Complaint did not seek relief concerning any previous election, but sought prospective injunctive relief concerning future elections. 2-ER-308-309. It sought not to provide advantage to any candidate over another, or any party over another, but rather to avoid an unreliable and inaccurate false vote count due to EVS.

All defendants moved to dismiss the Amended Complaint. 3-ER-588-589. Plaintiffs filed a motion ("MPI") asking the District Court to enjoin the use of EVS in Arizona during the litigation. 2-ER-162.

On July 21, 2022, the District Court held an abbreviated evidentiary hearing concerning the MPI. 3-ER-321. Plaintiffs were allowed two hours in which to present their evidence and entire case, and to argue the defendants' motions to dismiss the Amended Complaint. 3-ER-327 (7:16-17).

On August 10, 2022, Appellees Maricopa County and the members of the Board of Supervisors for Maricopa County (the "Maricopa Defendants") filed a separate motion ("Sanctions Motion") asking the District Court to sanction Plaintiffs

and their counsel for purportedly false or frivolous allegations in the Amended Complaint, under Fed. R. Civ. P. 11 and 28 U.S.C. § 1927. 2-ER-102.

The District Court dismissed the Amended Complaint and entered final judgment on August 26, 2022.[2] 2-ER-79-80; 3-ER-592. On December 1, 2022, the District Court entered an order ("Sanctions Order") granting the Sanctions Motion, without hearing oral argument on the motion, and ordered further briefing concerning the amount of sanctions. 1-ER-58. On May 24, 2023, the District Court heard oral argument concerning the amount and one attorney's arguments that the sanctions should not apply to him. 3-ER-594. On July 14, 2023, the District Court entered an order sanctioning appellant Attorneys in the amount of $122,000.[3] 1-ER-27.

Appellant Attorneys now bring this appeal of the District Court's decision to impose sanctions, which was explained in the December 1, 2022 Sanctions Order and effectuated in the July 14, 2023 Order. Appellant Attorneys assert that all legal work performed in this case was proper and did not violate any rule allowing or

---

[2] The Plaintiffs appealed the District Court order dismissing the Amended Complaint. Appeal No. 22-16413. Dismissal was affirmed on October 16, 2023.

[3] The other attorney was sanctioned ten percent of the total.

warranting sanctions. Appellant Attorneys do not appeal the District Court's determination of the amount of the sanction.[4]

## V. SUMMARY OF THE ARGUMENT

The Amended Complaint and the MPI had ample good faith legal and factual support, and far surpassed the standards of Rule 11 and 28 U.S.C. § 1927. The Sanctions Order was entered for the purpose, expressly stated by the District Court, of deterring future lawsuits to challenge the effectiveness and security of Arizona's EVS. That purpose does not supersede the elements of the Rule 11 and § 1927.

While this Court affirmed dismissal of the Amended Complaint, a much different standard governs whether appellant Attorneys should be sanctioned for filing it. To meet the standard of Rule 11, a pleading need only (a) not have an improper purpose, (b) be "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," and (c) have "evidentiary support" for its factual contentions. Fed. R. Civ. P. 11. "Rule 11 sets a low bar: It deters 'baseless filings' by requiring a 'reasonable inquiry' that there is some plausible basis for the theories alleged." *Strom v. United States*, 641

---

[4] The sanctions are concurrently being appealed by the other attorney in Appeal No. 23-16023.

F.3d 1051, 1059 (9th Cir. 2011). Sanctions are reversed where counsel "had some plausible basis," even if "quite a weak one" for an argument. *Id*. (quoting *United Nat'l Ins. Co. v. R & D Latex Corp.*, 242 F.3d 1102, 1117 (9th Cir. 2001)). *See also Lozano v. Cabrera*, no. 22-55273, 2023 U.S. App. LEXIS 5394 *4 (9th Cir. Mar. 7, 2023) (reversing Rule 11 sanctions for allegedly "baseless" lawsuit where party "raised colorable arguments" even though they were rejected).

The Amended Complaint easily meets all three elements of Rule 11. The District Court did not find an improper purpose. Plaintiffs cited ample authority for their legal theory, which was not disputed by the District Court. Plaintiffs provided extensive expert and other evidence to support their claims. Having met those three requirements, Plaintiffs satisfied Rule 11.

The District Court asserted there were "gaps" between the evidence relied upon by Plaintiffs and their legal claims. 1-ER-47-51. That assertion cannot sustain sanctions. Rule 11 requires that a party have evidentiary support for its claims, not that the evidentiary support must be sufficient to prevail in the eyes of the court. In reaching its "gaps" conclusion, the District Court applied an erroneous view of the law and disregarded the factual support for Plaintiffs' claims. The District Court also faulted the Amended Complaint for purportedly containing two false allegations. That conclusion does not sustain sanctions because in discerning these purported

misrepresentations, the District Court misconstrued the Amended Complaint. 1-ER-35-43. The statements criticized by the District Court are not false.

Lastly, the District Court imposed sanctions pursuant to 28 U.S.C. § 1927 on appellant Attorneys for bringing the MPI. 1-ER-55-56. Section 1927 prohibits unreasonable and vexatious multiplication of proceedings. Appellant Attorneys had a reasonable, good faith basis both for the legal and factual assertions in the MPI and for the time at which the MPI was brought. The MPI was neither frivolous nor reckless.

A desire to *carte blanche* deter litigation concerning Arizona's EVS is not a permissible basis to sanction claims that satisfy the requirements of Rule 11. The District Court abused its discretion in entering the Sanctions Order because its purpose for entering the order was improper, its factual findings were based on a clearly erroneous assessment of the evidence, and its legal conclusions were based on erroneous views of the law, including application of the wrong standards and misapplication of standards. The District Court misconstrued allegations in the Amended Complaint and discerned misrepresentations of fact that did not exist. The sanctions should be reversed.

# VI.   ARGUMENT

The District Court explained its purpose for imposing sanctions in this matter as follows:

> Imposing sanctions in this case is not to ignore the importance of putting in place procedures to ensure that our elections are secure and reliable. **It is to make clear that the Court will not condone litigants ignoring the steps that Arizona has already taken** toward this end and furthering false narratives that baselessly undermine public trust at a time of increasing disinformation about, and distrust in, the democratic process. **It is to send a message** to those who might file similarly baseless suits in the future.

1-ER-58 (emphasis added). The District Court made this statement concerning an Amended Complaint that alleges extensive facts challenging the reliability of Arizona's EVS, which the court dismissed pursuant to a Fed. R. Civ. P. 12 motion prior to any discovery. Plaintiffs were not given opportunity to prove whether their claims were "baseless."[5] Even so, the Amended Complaint alleges Arizona's EVS is not reliable, and Plaintiffs' experts provided testimonial evidence of facts supporting the allegation. The District Court rejected the allegations based on the untested say-so of government documents, lacking an evidentiary record or legal posture upon which it could draw meaningful conclusions about the strongly

---

[5] The District Court's hearing on the MPI limited Plaintiffs to two hours in which to present evidence and argue the motions to dismiss. 3-ER-327 (7:16-17).

contested facts concerning Arizona's EVS. Instead, it uncritically relied upon certain statutes and government certifications, which it characterized as "not subject to reasonable dispute." 2-ER-66 (n.5); 1-ER-42-43. Its decision to give conclusive weight to government claims about government activities and then sanction counsel for disputing the government's claims is contrary to law and dangerous.

The District Court's factual conclusions about "the steps Arizona has already taken" concerning election security, in a case terminated prior to discovery, and its desire to "make clear" and "send a message" concerning the substantive merits of the claims in this action, show that the sanctions were not imposed for violation of Fed. R. Civ. P. 11 or 28 U.S.C. § 1927. They were imposed because the District Court disagreed with Plaintiffs' claims and sought to prevent future prospective litigants from similarly challenging the security of Arizona's EVS, without regard to the merits of the challenge. The Sanctions Order effectively immunizes EVS against testing in federal court.

The sanctions are an abuse of discretion. While the District Court was not persuaded by the claims in the Amended Complaint, it cannot accurately be said that the claims were unsupported or unreasonable. This Court should reverse the Sanctions Order to make clear that attorneys who bring supported claims in federal

court do not incur the risk of sanctions if the district court wants to send a message deterring that type of claim.

**Standard of Review.** Review of an order imposing sanctions under Fed. R. Civ. P. 11 or under 28 U.S.C. § 1927 is for abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990); *Moore v. Keegan Mgmt. Co.*, 78 F.3d 431, 435 (9th Cir. 1996). "A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence." *Cooter & Gell*, 496 U.S. at 405. This Court has found an abuse of discretion and reversed Rule 11 sanctions where the appellant's legal position was "at the very least plausibly argued" and "not so groundless as to warrant the imposition of sanctions," *Fed. Sav. & Loan Ins. Corp. v. Molinaro*, 923 F.2d 736, 739 (9th Cir. 1991), where the district court's holding that complaints were frivolous "was based on an erroneous view of the law," *Montrose Chem. Corp. v. Am. Motorists Ins. Co.*, 117 F.3d 1128, 1134 (9th Cir. 1997), where the plaintiff produced "statistical evidence suggesting possible bias" in support of a Title VII claim, *Warren v. City of Carlsbad,* 58 F.3d 439, 444 (9th Cir. 1995), and where the complaint "suggest[ed] an attempt to establish a claim" that was not barred by res judicata, though it was "not pleaded distinctly enough to establish a plausible claim,"

*Lee v. POW Ent.*, No. 20-55928, 2021 U.S. App. LEXIS 35881, *4 (9th Cir. Dec. 6, 2021).

### A. <u>No Basis Exists to Impose Rule 11 Sanctions.</u>

Rule 11 sanctions may be imposed for signing a paper if it is (1) filed for an improper purpose or (2) frivolous. *Townsend v. Holman Consulting Corp.*, 929 F.2d 1358, 1362 (9th Cir. 1990). For a filing to be "frivolous," it must be "*both* baseless *and* made without a reasonable and competent inquiry." *Moore*, 78 F.3d at 434. "Rule 11 sets a low bar: It deters 'baseless filings' by requiring a 'reasonable inquiry' that there is some plausible basis for the theories alleged." *Strom v. United States*, 641 F.3d 1051, 1059 (9th Cir. 2011). "[T]o constitute a frivolous legal position for purposes of Rule 11 sanction, it must be clear under existing precedents that there is no chance of success and no reasonable argument to extend, modify or reverse the law as it stands." *Id*. (quoting *Simon DeBartolo Grp., L.P. v. Richard E. Jacobs Grp., Inc.*, 186 F.3d 157, 167 (2d Cir. 1999)). Sanctions are reversed where counsel "had some plausible basis, albeit quite a weak one" for an argument. *Strom*, 641 F.3d at 1059 (quoting *United Nat'l Ins. Co. v. R & D Latex Corp.*, 242 F.3d 1102, 1117 (9th Cir. 2001)). *See also Lozano v. Cabrera*, no. 22-55273, 2023 U.S. App. LEXIS 5394 *4 (9th Cir. Mar. 7, 2023) (reversing Rule 11 sanctions for allegedly "baseless" lawsuit where party "raised colorable arguments" even though they were rejected); *Warren*, 58 F.3d at 444 (reversing Rule 11

sanctions where plaintiff had evidence to support claim, although not sufficient to avoid summary judgment).

Rule 11 can be "used to chill vigorous advocacy" if sanctions are imposed too readily. *Townsend*, 929 F.2d at 1364. The rule must be applied with care, because "our system of litigation *is* an adversary one" and "presenting the facts and law as favorably as possible in favor of one's client is the nub of the lawyer's task." *United Nat'l Ins. Co.*, 242 F.3d at 1115.

The Amended Complaint and MPI were not brought for an improper purpose, were not brought without a reasonable and competent inquiry, and were not baseless. The Sanctions Order rests on the District Court's application of a different standard – a requirement that the claims and evidentiary support meet with the District Court's approval after consideration of public policy.

### 1. The Amended Complaint Satisfies Rule 11 Because It States Claims with Legal and Evidentiary Support.

The legal theories and factual allegations in the Amended Complaint and the MPI have a good faith basis in law and fact and signify reasonable and competent pre-filing inquiry by counsel.

**Legal Basis.** The legal theory of the Amended Complaint asserted that use of EVS would violate the Plaintiffs' constitutional right to vote by causing election results to be determined by vote tallies that are not known to be reliable, and by

17

permitting vote manipulation. A broad body of Supreme Court decisions affirms a constitutional right to vote. *FEC v. Akins*, 524 U.S. 11, 25 (1998); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992); *Reynolds v. Sims,* 377 U.S. 533, 556 (1964); *Gray*, 372 U.S. at 380; *Baker v. Carr*, 369 U.S. 186, 208 (1962); *Saylor*, 322 U.S. at 386; *United States v. Classic,* 313 U.S. 299, 315 (1941). This right includes the right to an accurate tally of the legally cast votes. The right may not be "destroyed by alteration of ballots . . . nor diluted by ballot-box stuffing," and "obviously" includes the right of voters "to cast their ballots and have them counted." *Reynolds*, 377 U.S. at 555 (citing *Classic,* 313 U.S. at 315, *Saylor,* 322 U.S. 385, and *Ex parte Siebold,* 100 U.S. 371 (1880)); *see Saylor*, 322 U.S. at 386 (right to vote means vote is "given full value and effect" and is not "impaired, lessened, diminished, diluted and destroyed by fictitious ballots fraudulently cast and counted, recorded, returned, and certified"). At least one federal district court has permitted a similar complaint against use of electronic voting machines to proceed based on this legal theory, denying a motion to dismiss. In *Curling v. Kemp*, 334 F. Supp. 3d 1303, 1316 (N.D. Ga. 2018), the court held that "plausibly alleg[ing] a threat of a future hacking event that would jeopardize their votes and the voting system at large" was the "sort[] of alleged harm[]" that was recognized as an injury "sufficient to confer standing" on plaintiffs. That decision permitted a lawsuit to proceed against Georgia's use of

electronic voting machines on the allegation that the machines infringed the fundamental right to vote due to lack of security. *Id*. at 1312, 1318-19, 1325.

Appellant Attorneys reasonably concluded that existing law or an extension of it permitted these Plaintiffs, candidates for election, to challenge the use of EVS on the basis of the likelihood of vote manipulation, and to seek injunctive relief. Indeed, the District Court's dismissal order did not question the existence of the right to vote or its applicability in these circumstances, but simply asserted that the risk of vote hacking in Arizona was "too speculative" and not plausible. 2-ER-73-75. Yet Plaintiffs relied on the Eighth Circuit's decision in *Carson* for the proposition that candidates have standing to ensure "the final vote tally accurately reflects the legally valid votes cast." 978 F.3d at 1058; *see* 2-ER-134, 137.[6] In view of the Supreme Court decisions cited above and *Curling*, Plaintiffs' legal theory plainly was warranted under existing law or was a non-frivolous argument for extending, modifying, or reversing existing law or establishing new law, easily sufficient to meet the standard of Rule 11.

-----

[6] The District Court in its dismissal order construed candidate standing as limited to situations where "the playing field is tilted" against a candidate. 2-ER-15. *Carson*'s statement of the law did not require tilting for a candidate to have standing. Plaintiffs' position was supported by law, though it did not prevail.

**Evidentiary Support.** The fifty-page Amended Complaint alleged that "All electronic voting machines and election management systems, including those slated to be used in Arizona in the Midterm Election, can be manipulated through internal or external intrusion to alter votes and vote tallies." 2-ER-265 (¶ 24). It alleged specific facts to support this overarching point:

- EVS have misreported votes in elections, including in Alabama, North Carolina, Nebraska, and Texas. 2-ER-273-274 (¶ 73). In 2021, an "anomaly" in Dominion ballot tabulators excluded ballots from poll report totals in Tennessee, which federal investigators attributed to "erroneous code" in the system. 2-ER-288 (¶ 116). In Georgia, 17,724 votes that had been counted and certified through tabulation machines had no corresponding ballot images. 2-ER-279 (¶ 85).

- On numerous occasions, hacks of EVS have been found or demonstrated. In June 2018, then-Senator Kamala Harris warned during a Senate committee hearing that she had seen election machines "hacked" during a demonstration. 2-ER-284 (¶ 98). In the *Curling* litigation, cybersecurity expert Professor J. Alex Halderman of the University of Michigan examined Dominion electronic voting equipment and found "numerous security vulnerabilities" that "would allow attackers to install malicious software." 2-ER-294-295

(¶ 139). He stated that he could "demonstrate proof-of-concept malware that can exploit them to steal votes," and that the equipment "is very likely to contain other, equally critical flaws that are yet to be discovered." *Id.* He stated that this equipment, the ICX, would be used in 2022 in "for accessible voting in Alaska and large parts of Arizona . . ." *Id.*

- Serious security deficiencies in EVS have been attested by a broad spectrum of knowledgeable individuals. In December 2019, four U.S. Senators and a Congressman published an open letter concerning the major EVS manufacturers, saying they "have long skimped on security in favor of convenience" and left voting systems across the country "prone to security problems." 2-ER-283 (¶ 96). A nominee to the Federal Election Commission previously alleged that voting machines switched votes in 2018 in Georgia. 2-ER-285 (¶ 102). Computer scientists from Johns Hopkins University and Rice University characterized the GEMS election management software, which was acquired by Dominion and incorporated into its products in 2010, as "far below even the most minimal security standards applicable in other contexts [and] unsuitable for use in a general election." 2-ER-275-276 (¶ 76). For a decade GEMS has been notorious as "a vote rigger's dream" that "could be hacked, remotely or on-site, using any off-the-shelf version of Microsoft

Access." *Id*. In 2020, a computer expert identified security risks he characterized as "extreme" in Dominion EVS used in Georgia, including optical scanners. 2-ER-278 (¶ 83).

- EVS have been found to have internet connections and "backdoor" access, features that provide a means of hacking them. During a March 2018 Senate committee hearing, Sen. Wyden stated, "Forty-three percent of American voters use voting machines that researchers have found have serious security flaws including backdoors. . . . The biggest seller of voting machines is doing something that violates cyber-security 101, directing that you install remote-access software which would make a machine like that a magnet for fraudsters and hackers." 2-ER-283 (¶ 95). In 2019, election security experts found "nearly three dozen backend election systems in 10 states connected to the internet over the last year," and said some jurisdictions "were not aware that their systems were online" and publicly stated that the systems were never connected to the internet "because they didn't know differently." 2-ER-279 (¶ 86). EVS manufacturer ES&S falsely denied selling voting machines with remote access software, then later admitted that it had done so. 2-ER-280 (¶ 88).

- The federal government has unequivocally stated that foreign states attempted to hack election-related computer systems and EVS manufacturers during the 2016 U.S. election cycle, sometimes succeeding. "Russian agents probed voting systems in all 50 states, and successfully breached the voter registration systems of Arizona and Illinois," and targeted vendors that provide election software and their employees. 2-ER-277 (¶ 79). In January 2018, a Congressional Task Force on Election Security issued a report stating, with respect to the 2016 election, "Russian agents targeted election systems in at least 21 states, stealing personal voter records and positioning themselves to carry out future attacks. . . media also reported that the Russians accessed at least one U.S. voting software supplier . . . in Arizona and Illinois, voter registration databases were reportedly breached. . . If 2016 was all about preparation, what more can they do and when will they strike?" 2-ER-282 (¶ 94). In March 2022, the White House press secretary stated that the Russian government in 2016 "hacked our election here." 2-ER-285 (¶ 101).

- Knowledgeable individuals have predicted with high confidence the hacking of future U.S. elections. Jake Braun, a former security advisor for the Obama administration and organizer of a prominent hacking conference, stated, "the 2020 election will be hacked no matter what we do." 2-ER-277 (¶ 80). When

asked about possible future election interference by Russia, "then-FBI Director James Comey testified before Congress that: '[T]hey'll be back. They'll be back in 2020. They may be back in 2018.'" 2-ER-285 (¶ 94). In *Curling*, the court concluded after evidentiary hearings that the Dominion system used in Georgia was plagued by security risks and the potential for votes to be improperly rejected or misallocated, stating, "The Plaintiffs' national cybersecurity experts convincingly present evidence that this is not a question of 'might this actually ever happen?' – but 'when it will happen.'" 2-ER-279 (¶ 84). Then-Senator Harris stated in 2018, "I'm very concerned you could have a hack that finally went through. You have 21 states that were hacked into, they didn't find out about it for a year." 2-ER-284 (¶ 98). Senator Wyden stated, "[W]hat we see in terms of foreign interference in 2020 is going to make 2016 look like small potatoes. . . [T]he lack of cybersecurity standards leads local officials to unwittingly buy overpriced, insecure junk. Insecure junk guarantees . . . other hostile foreign governments can influence the outcome of elections through hacks." 2-ER-284-285 (¶ 100).

Evidence and information provided to the District Court in support of the MPI provided further good faith factual basis for likelihood of future EVS hacking. Professor Halderman testified to the Senate, "I know America's voting machines are

vulnerable" to cyber attacks "because my colleagues and I have hacked them repeatedly as part of a decade of research studying the technology that operates elections." 2-ER-170. A law review article from December 2020 cited election computer systems as paradigmatic examples of software failure: "The best-documented example" of "flaws in software that had been certified by outside parties" is "voting machines, where outside auditors have *always* found flaws." Steven M. Bellovin et al., *Seeking the Source: Criminal Defendants' Constitutional Right to Source Code*, 17 Ohio St. Tech. L. J. 1, 35 (Dec. 2020); 2-ER-170. As a result, "[t]here is broad consensus among elections experts that modern software systems are, by virtue of their design, too complex and unreliable to be relied upon for determining the outcomes of civil elections." 17 Ohio St. Tech. L. J. at 36-37.

The MPI was supported by sworn declarations from five expert witnesses. 2-ER-200-258 & 3-ER-588 (ECF 35-41). Among them were (1) Douglas Logan, a cybersecurity professional with over a decade of experience focused on application security, who evaluated Dominion voting machine software in three states including Arizona, and who led the post-election audit of Maricopa County's 2020 election results commissioned by the Arizona Senate, 2-ER-209-210 (¶¶ 3-10); (2) Benjamin Cotton, a computer forensics professional with twenty-six years of experience, who evaluated Dominion voting systems in four states including Arizona, and who

25

testified to the Arizona Senate concerning digital forensics findings in the audit of Maricopa County's 2020 election results, 2-ER-227-228 (¶¶ 3-9); (3) John R. Mills, former Director of Cybersecurity Policy, Strategy, and International Affairs in the Office of the Secretary of Defense, who had nearly 40 years of experience with cybersecurity-related activities, including use of and defense against unauthorized remote access into computer networks, 2-ER-200-203 (¶¶ 2-9); and (4) Professor Walter Daugherity, who taught computer science and engineering at Texas A&M University for 32 years, 2-ER-242 (¶ 2). Professor Daugherity's declaration articulated an analysis of Arizona voting data, within which he identified the effect of a "software coded algorithm" to artificially manipulate vote tallies. 2-ER-243-244 (¶¶ 6-11). Defendants did not present evidence to the District Court to dispute Professor Daugherity's analysis. At hearing on the MPI, Plaintiffs presented testimony from Mr. Cotton, Mr. Logan, Mr. Mills, and from Clay Parikh, an information systems security professional who worked for nine years as a contractor for a test lab that performed security testing on EVS for the federal and state certification process. 3-ER-434-435 (114:8-115:18).

- Mr. Parikh testified that as part of the certification security testing he was able to hack into Dominion and ES&S voting systems. 3-ER-435-438 (115:11-118:5). He testified that he had wanted to perform more comprehensive

security procedures to show that data could be manipulated on the equipment, but he was not permitted to do this work. 3-ER-446-447 (126:3-127:3).

- Mr. Cotton testified that the Dominion systems used by Maricopa County had serious security deficiencies and showed evidence of remote anonymous log-ins. 3-ER-340-347 (20:11-27:13). He testified that Maricopa County's security procedures can be easily bypassed, and that high security computer networks have been penetrated, including at the NSA. 3-ER-347-349 (27:14-29:6). He testified that the Maricopa County system did not have security to prevent access. 3-ER-349 (29:14-21).

- Mr. Logan testified that the federal EAC certification process for EVS, from his observation of certified systems, would not meet "any cybersecurity standard that is established in any other domain or any other industry of our country." 3-ER-382 (62:15-20). He testified that certain requirements for federal EAC certification "create[d] a vulnerable system." 3-ER-383 (63:3-21). He testified that intrusions into EVS can occur without detection. 3-ER-404 (84:1-19). He testified that anyone who knew the shared password for the Maricopa County election management server had the capability to log in to the database and change voting results. 3-ER-406 (86:3-18).

- Mr. Mills testified that high security computer systems operated by the federal government, both civilian and military, have suffered cybersecurity breaches, and that starting around 2009 the federal government adopted a policy of always presuming breach of these systems, because the opponent could always find a way to get in. 3-ER-410-412 (90:8-91:8).

The Amended Complaint credibly alleged facts to show that EVS are known to misreport vote tallies, that EVS have long been criticized by knowledgeable persons for security vulnerabilities that leave them open to vote manipulation, that hacks of voting machines have been demonstrated, that a foreign government successfully hacked voting-related computer systems in connection with the 2016 election, and that future hacking of U.S. elections is expected or even guaranteed by knowledgeable persons. The Amended Complaint connected these allegations to Arizona. It identified that an election-related computer system was actually hacked in Arizona in 2016. 2-ER-282 (¶ 94). It alleged that examination of Maricopa County's EVS after the 2020 election showed missing files, lost data, and inadequate cyber security. 2-ER-292 (¶ 132). The Amended Complaint specifically targeted the "Dominion Democracy Suite 5.5b voting system" and the "ES&S ElectionWare 6.0.40 voting system" and their component parts used by counties in Arizona. 2-ER-264-265, 272, 294 (¶¶ 14, 18-19, 23, 66, 68, 137-38). It alleged that Arizona's post-

election audit measures do not remediate the security problems in its use of EVS. 2-ER-295-296 (¶¶ 144-151).

The facts pleaded by the Amended Complaint reasonably support Plaintiffs' good faith claims that Arizona's EVS are likely to be hacked, and votes changed, in future elections. The Amended Complaint has ample evidentiary support and more than meets the standard of Rule 11.

### 2. The Sanctions Order's Rule 11 Conclusion Misapplies the Law and Relies Upon Clearly Erroneous Factual Determinations.

The Sanctions Order disregarded the legal basis and evidentiary support for the claims in the Amended Complaint and asserted that the Amended Complaint violated Rule 11 in four ways. 1-ER-35-43, 47-53. Each of these four bases for sanctions relied on an erroneous view of the law, a clearly erroneous factual finding, or both.

### a. The Attorneys Did Not Fail to Conduct a Reasonable Pre-Filing Inquiry.

The District Court faulted appellant Attorneys for purportedly failing to conduct a reasonable pre-filing inquiry. 1-ER-51-53. The District Court did not reconcile this conclusion with the Amended Complaint's extensive paragraphs describing the EVS used by the Defendants, 2-ER-264-265, 271-273, 285-286, 294-295 (¶¶ 18-21, 23, 65-70, 103-107, 138-41), applicable Arizona statutes, 2-ER-268, 293-294, 299-301 (¶¶ 47, 136-37, 156-58, 162-63), historical events showing that

29

EVS are not secure against vote manipulation, 2-ER-265-266, 270-271, 273-288, 291-293, 295-296 (¶¶ 24-32, 58-61, 71-102, 110-116, 125-134, 145-150), nor the testimony summarized above. The Amended Complaint and the MPI submissions and testimony exhibit extensive pre-filing investigation by appellant Attorneys, well beyond the inquiry required by Rule 11. The experts that appellant Attorneys consulted were, themselves, "a way to investigate a claim's factual plausibility." *King v. Whitmer*, 71 F.4th 511, 522 (6th Cir. 2023).

The District Court nevertheless found that "Plaintiffs evidently failed" to conduct a reasonable inquiry and said it "need not conduct a further evidentiary inquiry to make this finding," based on its view that "publicly available and widely circulated information" contradicted Plaintiffs' claims. 1-ER-52-53. None of the considerations cited by the District Court support its conclusion. Aside from an incorrect paper ballot issue (addressed below), the Sanctions Order cited only irrelevant matters to support its finding of inadequate pre-filing inquiry: (1) an order sanctioning a different law firm, in a different lawsuit; (2) "the dangers posed by making wide-ranging allegations of vote manipulation in the current volatile political atmosphere"; and (3) "concern" about "unfounded claims about election-related misconduct." 1-ER-52. None of these, nor anything else in the Sanctions Order, show or support the conclusion that appellant Attorneys violated Rule 11 by

neglecting to conduct an adequate pre-filing inquiry.

The District Court's conclusions regarding pre-filing inquiry were based not on evidence but rather on public controversies and a sanctions order entered against a different law firm in a different case. Plaintiffs and the appellant Attorneys are permitted to bring litigation presenting a contrary perspective on these matters, so long as their papers have support within the meaning of Rule 11. That remains true even if publicly available information also supports other conclusions. Rule 11 does not require that a complaint be uncontradicted by publicly available information; it requires that allegations in a complaint have evidentiary support. The Amended Complaint and the MPI had ample support. The District Court's assertion that Plaintiffs did not perform pre-filing inquiry was based on a clearly erroneous assessment of the relevant facts and on application of an erroneous legal standard.

### b. Plaintiffs' Claims Were Not Based on Speculation and Conjecture.

The District Court asserted that "Plaintiffs lacked an adequate factual or legal basis to support the wide-ranging constitutional claims they raised or the extraordinary relief they requested" and "presented mere conjectural claims of potential injuries" because of purported "gaps between their factual assertions, claimed injuries, and requested relief." 1-ER-51. The District Court cited no authority to support the imposition of sanctions based upon such a subjective,

ambiguous standard as "gaps between their factual assertions, claimed injuries, and requested relief." Nor did the District Court cite any authority that seeking prospective relief for anticipated future harm is sanctionable under Rule 11 if the trial court believes the future harm is not sufficiently likely.

The District Court's "gaps" conclusion applies an erroneous view of the law to a clearly erroneous view of the relevant facts. Though the claims in the Amended Complaint ultimately failed in the District Court's eyes, the claims had support in law and fact and satisfied the standard of Rule 11. The District Court's treatment of the claims effectively grants state governments immunity against any federal court accountability for the operation of their election systems, so long as the states have written procedures that purport to secure the systems. That is a dangerous and wrong outcome. The District Court's "gaps" basis for imposing sanctions should be reversed for five reasons.

**The "Gaps" Conclusion Rests upon a Misstatement of Law.**  First, the "gaps" conclusion rests on misstatement of law. The District Court faulted Plaintiffs for failing to show that vote manipulation during the 2022 election was "certainly impending." 1-ER-48-49. "Certainly impending" is not the correct standard. The Supreme Court has made clear that "An allegation of future injury may suffice" to establish standing if "there is a substantial risk that the harm will occur." *Susan B.*

*Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation omitted). The Supreme Court has also stated that "standing requires that the plaintiff 'personally has suffered some actual **or threatened** injury,'" and "This does not mean, however, that the **risk of real harm** cannot satisfy the requirement of concreteness." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339, 341 (2016) (emphases added) (quoting *Valley Forge Christian College v. Am. United for Sep. of Church & State*, 454 U.S. 464, 472 (1982)). Similarly, this Court has "long held that a threatened injury may constitute an injury in fact where, as here, there is 'a credible threat of harm' in the future, rather than a speculative fear 'of hypothetical future harm.'" *Election Integrity Project Cal. Inc., v. Weber,* no. 21-56061, 2022 U.S. App. LEXIS 30549, at *5 (9th Cir. Nov. 3, 2022) (citing *Krottner v. Starbucks Corp*., 628 F.3d 1139, 1143 (9th Cir. 2010)). *See also Sierra Club v. United States EPA*, 774 F.3d 383, 392 (7th Cir. 2014) ("increased probability of injury" can provide standing).

The District Court sanctioned appellant Attorneys for failing to meet a legal requirement ("certainly impending") that does not exist. The claims in the Amended Complaint meet the correct standard, which tests whether the complaint pleads a substantial risk or a credible risk of harm. Moreover, even if the District Court disagreed that the Amended Complaint pleaded a substantial risk of harm, the different judgment of appellant Attorneys on that point is not a basis to impose

sanctions. A claim is not sanctionable merely because it is unsuccessful. *King*, 71 F.4th at 529. Appellant Attorneys had a reasonable basis to plead that there is a substantial or credible risk of vote manipulation on Arizona's EVS. Under Rule 11, that is enough.

**The "Gaps" Conclusion Failed to Correctly Apply the Standard for Determining Whether a Claim is Frivolous.** Second, the "gaps" conclusion fails to consider or properly apply the law governing frivolous claims. Rule 11 obligates counsel to have a proper purpose, a basis for the claims and legal contentions that is warranted by existing law or a nonfrivolous argument for establishing new law, and "evidentiary support" for the factual contentions. The District Court did not find that appellant Attorneys had an improper purpose, and as described above the Amended Complaint met the other two requirements.

The District Court was not persuaded, but its disagreement does not cause the support for the claims to disappear. "[T]he inquiry into the propriety of Rule 11 sanctions for filing frivolous claims is whether a reasonably competent attorney would believe at the time of the filing that the plaintiff had a legal right under 'existing law' or a 'good faith argument for the extension, modification, or reversal of existing law.'" *Ault v. Hustler Magazine*, 860 F.2d 877, 884 (9th Cir. 1988) (citing *Zaldivar v. City of L.A.*, 780 F.2d 823, 830 (9th Cir. 1986)). The Amended Complaint

met this standard.

The District Court did not weigh the reasons cited by Plaintiffs for bringing the lawsuit, expressly declining to engage any "in-depth discussion of Plaintiffs' allegations and supporting evidence." 1-ER-48. Instead, it recited various points argued against the Amended Complaint and held the claims were sanctionable. 1-ER-48-51. Its one-sided approach is contrary to the requirements of Rule 11. A district court necessarily must explain why the arguments advanced in support of a complaint do not support the claims at all, before it can find that the claims lacked support.

Furthermore, when considering sanctions for allegedly frivolous claims, a district court should "resolve all doubts in favor of the signer." *Rodick v. City of Schenectady*, 1 F.3d 1341, 1350 (2d Cir. 1993); *United Bank of Ariz. v. Sun Mesa Corp.*, 119 F.R.D. 430, 435 (D. Ariz. 1988) (citing *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986). The District Court here resolved all doubts *against* the signers. Such an approach must not be affirmed, where the District Court's stated purpose is to deter – chill – future attorneys from similar claims. This Court has warned against the potential for Rule 11 to be "used to chill vigorous advocacy." *Townsend*, 929 F.2d at 1364.

The District Court's analysis, which declined to consider Plaintiffs'

allegations and evidence and which resolved ambiguities against the signers of the pleadings, applied an erroneous view of the law concerning frivolous claims.

**The "Gaps" Conclusion Rests on Facts That Do Not Exist.** Third, the "gaps" conclusion is fatally flawed because it mischaracterizes the facts alleged in the Amended Complaint, faulting the Attorneys for purported "gaps" that do not exist.

Fed. R. Civ. P. 8(a) requires a complaint to plead only[7] a "short and plain statement of the claim showing that the pleader is entitled to relief." The Amended Complaint more than met that obligation by pleading (i) that Plaintiffs have a constitutional right to have their ballots and all ballots cast together with theirs counted accurately, 2-ER-260-261 (¶ 2); (ii) Plaintiffs' rights will be violated if Arizona uses EVS  because all EVS are not reliably secure and can be manipulated to alter votes and vote tallies, and the safety measures intended to protect them can be defeated, 2-ER-260-261, 265-266, 295, 302 (¶¶ 2, 3, 24, 31, 144-45, 174); (iii) security failures in EVS have been identified and publicized for many years, 2-ER-261-262, 266, 273-276, 279-281, 282-284 (¶¶ 4-5, 32, 72-78, 86, 89, 93, 95-97); (iv) EVS have misreported vote tallies in elections, 2-ER-273-274, 288 (¶¶ 73, 116); (v)

---

[7] Other than the court's jurisdiction and a demand for the relief sought.

hacks to change votes on EVS have been demonstrated, 2-ER-275-276, 280-281 (¶¶ 75, 78, 89); (vi) knowledgeable experts have warned that hacking of EVS in future elections is to be expected, including a former Obama administration security advisor who warned that the 2020 election "will be hacked no matter what we do," 2-ER-276-277, 279, 282-285 (¶¶ 78, 80, 84 94-100); (vii) the Russian government hacked election-related computers during the 2016 presidential election, 2-ER-277, 282, 285 (¶¶ 79, 94, 101); (viii) EVS used in Arizona can be manipulated to modify election data, 2-ER-294-295, 300 (¶¶ 138-140, 143, 158-160).

These factual allegations are specific, detailed, and tightly linked. They identify the legal right asserted, describe how the right will be violated, and show that the likelihood of the right being violated is high, based on past experience and predictions of knowledgeable individuals. The relief sought – an injunction against using EVS – redresses the anticipated constitutional harm.

The District Court's conclusion that there were sanctionable "yawning gaps" between the allegations in the Amended Complaint, the harm claimed, and the ultimate relief requested is clearly erroneous. The Sanctions Order did not dispute that Plaintiffs have a constitutional right to vote that includes a correct and transparent vote tally, or that a hacked EVS resulting in vote manipulation would infringe this right. The Sanctions Order merely discounted the likelihood of this

happening, based not on evidence but on uncritical acceptance of the assertions in government statutes and certificates. 2-ER-66 (n.5); 1-ER-42-43. Yet the Amended Complaint alleged facts showing that such an event is highly likely.

The allegations in the Amended Complaint, alone, meet the requirements of Rule 11. Appellant Attorneys went much further. They presented qualified expert testimony concerning Arizona EVS from Mr. Cotton and Mr. Logan. 2-ER-213-215, 230-239, 3-ER-340-349, 406 (20:21-29:6, 29:14-21, 86:3-18). Both played leadership roles in the audit of the 2020 election in Maricopa County commissioned by the Arizona Senate, and had detailed knowledge of the EVS used in Maricopa County. 2-ER-210, 228, 3-ER-358. Appellant Attorneys relied on technical information and analysis provided by these experts. "Attorneys are rarely sanctioned for relying upon experts: expert testimony by definition rests on 'specialized knowledge[.]'" *King*, 71 F.4th at 522. In contrast to the unqualified individuals at issue in *King*, the experts relied on by appellant Attorneys were credentialed, experienced, and accomplished within relevant fields.

Appellant Attorneys met the standard of Fed. R. Civ. P. 8 and 11. The District Court's "gaps" conclusion clearly erred by ignoring the substantial allegations and evidence that filled the purported "gaps."

**The "Gaps" Conclusion Impermissibly Sanctioned the Attorneys for the**

**Relief Sought in the Amended Complaint.** Fourth, the District Court wrongly faulted the Amended Complaint for seeking injunctive relief "[m]ere months away from the 2022 midterm election." 1-ER-51. However, a request for relief can be "tailor[ed] as the case proceeds" and does not make nonfrivolous legal claims sanctionable. *King*, 71 F.4th at 529. That is particularly the case here, where the relief considered unworkable by the District Court was only a part of the overall request for relief, and where the right intended to be vindicated is of such constitutional magnitude as the right to vote.

Numerous courts have granted preliminary injunctions affecting the administration of upcoming elections. *E.g. Sanchez v. Cegavske*, 214 F. Supp. 3d 961, 977 (D. Nev. 2016) (requiring state to implement specified election procedures); *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012) (affirming preliminary injunction prohibiting enforcement of state election statute); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1351 (11th Cir. 2005) (affirming preliminary injunction against state voter registration policy); *Ga. State Conf. of the NAACP v. Fayette Cty. Bd. of Comm'rs*, 118 F. Supp. 3d 1338, 1347 (N.D. Ga. 2015) (granting temporary injunction against county election procedures that effectively denied plaintiffs' right to vote by diluting votes). Infringement of the constitutional right to vote is worthy of judicial intervention to redress. Voting is "the most basic

of political rights." *FEC*, 524 U.S. at 25. It is "preservative of other basic civil and political rights," and "any alleged infringement" of it "must be carefully and meticulously scrutinized." *Reynolds*, 377 U.S. at 562. The right to vote encompasses the right to have one's vote "correctly counted and reported," *Gray*, 372 U.S. at 380, and not debased or diluted by the introduction of fraudulent votes, *Reynolds,* 377 U.S. at 557. Defendant Arizona Secretary of State admitted in its opposition to the MPI, "There may well be cases where a state election rule is so constitutionally problematic . . . that a federal court must intervene, even shortly before an election." 2-ER-127 n.5 (quoting *Mi Familia Vota v. Hobbs*, 977 F.3d 948, 953 (9th Cir. 2020)).

The Amended Complaint sought relief applicable to any future election. 2-ER-308. If the District Court believed insufficient time remained before the 2022 election to grant relief, it could have granted relief effective only after the 2022 election. It was not reasonable to sanction appellant Attorneys for seeking relief applicable to the most immediate election as well as to subsequent elections. If the Amended Complaint had, out of an abundance of caution, sought relief only applicable to elections post-2022, the District Court might have interpreted the omission as a concession that the claims in the Amended Complaint were not important – as the District Court baselessly criticized Plaintiffs for not including a

request for emergency relief in their appeal of the dismissal of the Amended Complaint. *See* 1-ER-56 n.11. The Sanctions Order whipsaws appellant Attorneys between criticism for taking action and also for not taking the same action later.

The District Court abused its discretion by holding that Plaintiffs' request for injunctive relief was a basis to impose sanctions. A request for relief is not a basis to impose sanctions, and the relief sought by the MPI had ample support.

**The Amended Complaint Was Not Speculative or Conjectural.** Fifth, the District Court wrongly found the claims in the Amended Complaint sanctionably speculative and conjectural. 1-ER-47-51. The District Court effectively required Plaintiffs to plead that votes had already been changed through the hack of electronic voting machines in a past election in Arizona, to surpass the purported threshold for a claim to not be speculative or conjectural. A contrary view of the law is well-supported. The district court in *Curling* held that "plausibly alleg[ing] a threat of a future hacking event that would jeopardize their votes and the voting system at large" was the sort of harm that permitted a plaintiff to bring an action. *Curling v. Kemp*, 334 F. Supp. 3d at 1316. In *Pavek v. Simon*, the district court found that a "very substantial risk" of harm to candidates' electoral prospects was sufficient to confer standing to challenge a state ballot regulation statute, stating, "The Supreme Court has held that '[a]n allegation of future injury may suffice' to satisfy the imminence

requirements of the injury-in-fact prong of Article III standing 'if the threatened injury is "certainly impending," *or* there is a "substantial risk that the harm will occur."'" 467 F. Supp. 3d 718, 743, 748 (D. Minn. 2020) (citing *Susan B. Anthony List*, 573 U.S. at 158).

Plaintiffs here plausibly alleged that a future hacking event was likely based on past experience and the predictions of knowledgeable individuals. The view that this satisfied the requirement to plead a substantial risk of future harm was supported by legal authority. A litigant is not obligated to wait until the vault is burgled before seeking judicial intervention to require the bank to secure the vault, where motive, means, and opportunity to burgle the vault all exist. Even if the District Court found Plaintiffs' evidence unpersuasive to show that a future hack of Arizona's EVS is likely, the court had no basis to sanction appellant Attorneys. A court's differing assessment of the likelihood of a future event does not cause a claim with support to become frivolous.

The Sanctions Order makes plain that the District Court disagrees with the Amended Complaint, trusts the security of Arizona's EVS, and does not want other litigants challenging Arizona's voting system. 1-ER-58. But Plaintiffs are not obligated to share the District Court's assessment of the security of Arizona's voting system, given the facts and the testimony they gathered to support their claims.

Plaintiffs' theory is closely comparable to the theory that the *Curling* plaintiffs, far from being sanctioned, used to initiate litigation in 2017 that is still pending today. *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1312 (N.D. Ga. 2020); N.D. Ga. no. 1:17-cv-02989-AT. There are factual differences between Georgia's system and Arizona's system, but those factual differences go to the respective success or failure of the claims, not to whether it was sanctionable to bring the claims at all.

In its "gaps" holding, the District Court relied upon an incorrect statement of the law governing a plaintiff's obligation to plead future harm, misapplied Rule 11, ascertained "gaps" in the Amended Complaint that do not exist, improperly faulted Plaintiffs for the relief sought in the Amended Complaint, and applied an incorrect standard for assessing whether anticipated harm is speculative or conjectural. These errors require reversal.

### c. The District Court Misconstrued the Amended Complaint Concerning Arizona's Use of Paper Ballots, and Sanctioned the Attorneys for Purported Misrepresentations That Were Never Made.

The lengthiest explanation offered by the District Court for imposing sanctions was an assertion that the Amended Complaint falsely alleged Arizona does not use paper ballots to vote. 1-ER-35-41. The Amended Complaint did not make such an allegation.

It would be unthinkable to claim that Arizona does not use paper ballots, in

an Arizona court before an Arizona judge and an Arizona jury undoubtedly well acquainted with voting using paper ballots. The Amended Complaint did not. Rather, it attacked Arizona's methods of *counting and tabulating* paper ballots through EVS. The Amended Complaint referred to the use of automated machines to count and tabulate votes as a "computer-based system" in contrast to human beings counting and tabulating votes, which it referred to as a "paper-based system." *E.g.* 2-ER-270, 273 (¶¶ 59, 71). At most this language was ambiguous, and the rest of the Amended Complaint, including both explicit and implicit references to Arizona's paper ballots, preclude construction of the pleading as falsely denying that Arizona uses paper ballots.

A district court must construe allegations in a complaint favorably toward the pleader. *Gladstone, Realtors v. Bellwood*, 441 U.S. 91, 112 (1979); *Nation v. DOI*, 876 F.3d 1144, 1163 n.24 (9th Cir. 2017) ("we have relied on the briefs on appeal to clarify the complaint, in compliance with our obligation to construe the complaint favorably to the plaintiff"). It must give the plaintiff "the benefit of every reasonable inference to be drawn from the well-pleaded facts." *Walleri v. Fed. Home Loan Bank*, 83 F.3d 1575, 1580 (9th Cir. 1996). Allegations in a complaint must be considered "collectively" and "as a whole." *Police Ret. Sys. v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014). Courts interpreting any legal text should

construe words based on the context in which they appear. "[I]t is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used,'" and "the same words, placed in different contexts, sometimes mean different things." *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993)). "'[C]ontext . . . is paramount,' because 'the reasonable interpretation of a word can change depending on the context in which it appears.'" *Enigma Software Grp. USA, LLC v. Malwarebytes, Inc.*, 69 F.4th 665, 672 (9th Cir. 2023) (quoting *Knievel v. ESPN*, 393 F.3d 1068, 1075 (9th Cir. 2005)); *Chubb Custom Ins. Co. v. Space Sys./Loral, Inc.*, 710 F.3d 946, 958 (9th Cir. 2013) ("because words necessarily derive meaning from their context, '[i]nterpretation of a word or phrase depends upon reading the whole statutory text . . .'") (quoting *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006)).

As applied in the context of Fed. R. Civ. P. 11, these principles of construction mean attorneys cannot be sanctioned for statements made in a complaint that are subject to multiple interpretations, merely because one unintended reading would make an allegation false, where another reading is not false. "Rule 11 neither penalizes overstatement nor authorizes an overly literal reading of each factual statement." *Navarro-Ayala v. Hernandez-Colon*, 3 F.3d 464, 467 (1st Cir.

1993) (Breyer, C.J.); *see also Gaymar Indus. v. Cincinnati Sub-Zero Prods.*, 790 F.3d 1369, 1376-77 (Fed. Cir. 2015) ("overstatements do not rise to the level of sanctionable litigation misconduct" under Rule 11); *Kiobel v. Millson*, 592 F.3d 78, 83 (2d. Cir. 2010); *Ackerman v. Pilipiak*, 457 B.R. 191, 202 (E.D.N.Y. 2011) ("awkwardly worded" statements not sanctionable where they were not "knowing misrepresentations").

Further, "The general rule is that statements must be taken in context, and that related parts of a document must be taken together," so "[t]hat a hasty reader might take the first paragraph out of context is not in the present circumstances enough to brand the memorandum as false." *Young v. City of Providence*, 404 F.3d 33, 41 (1st Cir. 2005) (internal citations omitted). *See also Navarro-Ayala*, 3 F.3d at 467 (motion should be read "fairly and as a whole").

In *Townsend*, this Court rejected the general "pleading-as-a-whole" rule but held, "The relation of the allegedly frivolous claim to the pleading as a whole" is a "relevant factor" in view of "the concern that Rule 11 will be used to chill vigorous advocacy." 929 F.2d at 1364. Appellant Attorneys intended the Amended Complaint to articulate an attack on Arizona's use of EVS of all kinds, accepting that Arizona uses paper ballots in conjunction with the EVS. The Amended Complaint, construed as a whole, reasonably conveyed that meaning. The District Court's contrary reading

was neither correct nor intended. For six reasons it must be reversed.

**The Amended Complaint Acknowledges, Presumes, and Requires that Arizona Uses Paper Ballots.** In numerous ways the Amended Complaint builds upon the common understanding, acknowledging, presuming, and requiring that Arizona uses paper ballots.

- The Amended Complaint acknowledges Arizona uses paper ballots, by expressly stating Arizona law requires EVS to "Provide a durable paper document that visually indicates the voter's selections." 2-ER-299-300 (¶ 157 (quoting A.R.S. § 16-446(B)).

- The Amended Complaint presumes Arizona uses paper ballots, by attacking Arizona's use of optical scanners, which are computerized equipment that scans paper ballots. *See* 2-ER-264-265, 298, ¶ 14 ("Every county in Arizona intends to tabulate votes cast in the Midterm Elections through optical scanners."), ¶ 154 ("Every county in Arizona . . . can simply and securely count votes cast on paper ballots without using centralized machine-counting or computerized optical scanners"), ¶ 23 (Arizona's "optical scanners . . . have been wrongly certified."). If the Amended Complaint claimed that Arizona did not use paper ballots, it would nonsensically allege Arizona uses equipment whose function is to scan paper ballots, while not using paper

47

ballots.

- The Amended Complaint requires that Arizona uses paper ballots, by attacking Arizona's use of Ballot Marking Devices or "BMD," which are electronic equipment used to create a paper ballot. 2-ER-264, 272 (¶¶ 16, 68).

- The District Court recognized that the Amended Complaint requires Arizona uses paper ballots. The court noted that the Amended Complaint refers to a hand count of votes commissioned by the Arizona Senate after the 2020 election, and explained that these references necessitate paper ballots. 1-ER-37. *See also* 1-ER-39 ("[I]t is true, as Plaintiffs note . . . that these allegations may be reasonably read to imply that other Arizona voters use paper ballots").

Notwithstanding these ways in which the Amended Complaint acknowledges, presumes, and requires that Arizona uses paper ballots, the District Court cited a non sequitur to explain reading a contrary falsehood into the Amended Complaint. The court said it gave no importance to the Amended Complaint's references to optical scanners because the Amended Complaint also attacks the use of other "electronic voting machines." 1-ER-38. The court's conclusion does not logically follow. An attack on other electronic voting machines does not prevent the Amended Complaint from *also* attacking the use of optical scanners. The District Court's analysis is the equivalent of inferring improper intent by assuming a litigant cannot walk and chew

48

bubble gum at the same time. The District Court does not, and cannot, explain how the Amended Complaint attacks the use of optical scanners without presuming the use of paper ballots for the optical scanners to scan.

Pursuant to ordinary principles of interpretation, the District Court was obligated to interpret the Amended Complaint as a whole, harmonizing its provisions where reasonable, and to conclude that the Amended Complaint did not falsely deny Arizona's use of paper ballots. *See Peterson v. Minidoka Cty. Sch. Dist. No. 331*, 118 F.3d 1351, *amended opinion at* 1997 U.S. App. LEXIS 36357, at *24 (9th Cir. July 8, 1997) ("The usual rule of interpretation of contracts is to read provisions so that they harmonize with each other, not contradict each other.").

**The District Court's Constructions of Other Language in the Amended Complaint Are Unreasonable.** The District Court claimed that certain language in the Amended Complaint falsely alleges Arizona does not use paper ballots. Its reading is unreasonable and incorrect for two reasons.

First, the District Court acknowledged that the Amended Complaint lacks any express statement that Arizona does not use paper ballots. *See* 1-ER-36. Together with the allegations discussed above, the absence of any express statement denying paper ballots is dispositive that the Amended Complaint does not make that false representation. Finding a false allegation solely by inference, 1-ER-36-39, is not

49

permissible where the inference reads into the pleading an implication contradicting its express language, presumptions, and logical requirements.

Second, none of the cited passages, read in context, support the District Court's inferential interpretation.

- Paragraphs 7 and 153, *see* 1-ER-36, describe in general terms relief sought by the Amended Complaint and a method of conducting elections that Plaintiffs believe constitutionally acceptable. These paragraphs do not claim, as the District Court construed them, 1-ER-36, that the current system lacks all listed features or all constitutionally necessary characteristics. A description of the constitutional target is not an assertion that the current system is devoid of all constitutional features. An "alternative framework" is a framework that, as a whole, is different from the existing framework as a whole. An alternative can share many features with the existing framework and still constitute an "alternative." Plaintiffs' alternative describes a system of vote counting that varies from the current system in the crucial function of using people, not machines, to count votes.

- Paragraphs 58-60, *see* 1-ER-36-37, appear in a section of the Amended Complaint titled "Background." 2-ER-270. They generally describe the evolution of voting methods in the United States following the 2000 presidential election in Florida. They do not describe Arizona's election system post-2002. They lead into a

series of other allegations describing in general terms the voting machine industry and Arizona's use of ballot marking machines, tabulation machines, and central tabulation machines. 2-ER-270-273 (¶¶ 61-70). Nothing in this section alleges that Arizona does not use paper ballots. A "computer-based system" is fully compatible with the use of paper ballots. That is the system Arizona currently has, recording votes on paper ballots but counting and tabulating them with computers. The District Court cited a technical definition of a "paper-based system" from an obscure federal government website, 1-ER-37, but Plaintiffs did not cite this website or its definition, and that is not what they meant in the Amended Complaint. The Amended Complaint used the phrase "paper-based system" to indicate a system in which ballots are counted by hand, and the phrase "computer-based system" to include a system that uses computers to count and tabulate votes. These are shorthand usages.

- Paragraph 102, *see* 1-ER-39, appears in a section titled, "State and Federal Lawmakers from Both Parties Have Long Been Aware of the Problems with Electronic Voting Systems." 2-ER-282, 285. The cited language, like the nine preceding paragraphs, does not purport to describe Arizona's specific election equipment.

The District Court's "paper ballot" construction read into the Amended Complaint an implied assertion that the Amended Complaint does not expressly

make, which contradicts other language and depends on reading language out of context. Rule 11 does not permit sanctioning a party based on such an interpretation of a pleading.

**The District Court's *Sue Sponte* Conclusions Are Unsupported.** The Sanctions Order faulted language in the Amended Complaint that was not addressed in the parties' briefing of the Sanctions Motion. Because the District Court ruled on the Sanctions Motion without oral argument, appellant Attorneys had no opportunity to address the language identified *sua sponte* by the court. The paragraphs at issue alleged that plaintiffs would be required to "cast [her/his] vote, and have [his/her] vote counted, through electronic voting systems." 2-ER-302 (¶¶ 168, 171). According to the Sanctions Order, "These assertions are wrong." 1-ER-38. Though the District Court stated that it was not considering these statements "sanctionable as false allegations," it nevertheless considered them "for purposes of evaluating the arguments Plaintiffs make." *Id*. at n.3.

The assertions in Paragraphs 168 and 171 are not wrong. A paper ballot passed through a ballot scanner to count votes, with electronic vote data later sent to another computerized device to be tabulated, is reasonably characterized as being "cast" and "counted" through "electronic voting systems." Comparable language was used by Maricopa County's employee Scott Jarrett at the MPI hearing, when he referred to a

"HiPro" ballot scanner as a "voting device." 3-ER-498 (178:17). Similarly, in a previous lawsuit concerning the 2016 presidential election, an affidavit submitted by expert witness Professor Halderman stated, "For ballots **cast through optical scanners**, a manual recount of the paper ballots, without relying on the electronic equipment, is necessary to reliably detect possible hacking." 2-ER-317 (¶ 19), (emphasis added).[8] The Amended Complaint's language about "cast[ing]" paper ballot votes "through" electronic voting systems was consistent with ordinary and expert usage when discussing optical ballot scanners. It was not incorrect, and it did not deny that Arizona uses paper ballots.

      **The District Court Relied Upon an Incorrect Characterization of *Curling*.**

The Sanctions Order asserted appellant Attorneys should not have relied on the *Curling* case as authority. 1-ER-38-39, 41. The District Court wrongly stated an important fact in *Curling* to reach this conclusion. The *Curling* plaintiffs challenged

---

[8] The Court may take judicial notice, for purposes of noting the use of language, of this document filed on December 7, 2016 in *Great America PAC v. Wisc. Elections Comm'n*, case no. 3:16-cv-00795-jdp in the U.S. District Court for the Western District of Wisconsin (ECF 27). If the Court concludes that it may not take judicial notice, appellant Attorneys request the opportunity to make a record concerning ordinary and expert usage of language about "casting" votes on paper ballots "through" EVS, since they were denied that opportunity by the District Court's *sua sponte* consideration of the issue.

Georgia's use of EVS manufactured by Dominion. *Curling v. Raffensperger*, 493 F. Supp. 3d 1264, 1268-69 (N.D. Ga. 2020). Plaintiffs cited one of the *Curling* district court's decisions as authority supporting their own standing to bring claims based on "plausibly alleg[ing] a threat of a future hacking event that would jeopardize their votes and the voting system at large." 2-ER-134; *see also* 2-ER-137. Plaintiffs cited another of the *Curling* district court's decisions to support the substantive allegations that EVS can be manipulated to change votes and hacking of a future election is likely. 2-ER-131, 172.

The District Court rejected *Curling* as a comparison to this case, stating, "the *Curling* case is nothing like this one, in part because **Arizona, unlike Georgia, uses paper ballots**." 1-ER-38-39 (emphasis added). Georgia does use paper ballots. The *Curling* opinion cited by the District Court, 1-ER-39 (citing *Curling*, 493 F. Supp. 3d 1264), makes clear that Georgia's system used paper ballots. *See* 493 F. Supp. 3d at 1273 ("electronic ballot markers shall produce paper ballots").

There are differences between *Curling* and this case, but *Curling* offers a precedent reasonably parallel to Plaintiffs' claims. It was neither improper nor frivolous for appellant Attorneys to cite *Curling* for the propositions for which they cited it.

The District Court falsely stated that Georgia does not use paper ballots, as a

reason to sanction appellant Attorneys for (purportedly) falsely alleging that Arizona does not use paper ballots. Both states do. The District Court clearly erred by sanctioning appellant Attorneys based on an incorrect characterization of the case that appellant Attorneys purportedly cited inappropriately.

**The MPI States that Arizona Uses Paper Ballots.** If any doubt existed whether Plaintiffs alleged that Arizona does not use paper ballots, that doubt was dispelled by submissions to the District Court after the Amended Complaint. The MPI states:

- "[Arizona] already requires the creation of paper ballots," and "[T]here is little chance that the fraud would be discovered by a hand count of the paper ballots at only two percent of precincts [in Arizona]." 2-ER-194.

- Arizona's EVS must "Provide a durable paper document" and this "paper document shall be used in manual audits and recounts." 2-ER-193.

Plaintiffs elsewhere argued:

- "[U]se of electronic equipment to scan and count ballots is not reliable and secure, and [] hand counting of the paper ballots, visible and open to the public, is necessary." 2-ER-147.

- "[U]nder Arizona's voting system no human ever looks at the paper ballots from 98% of the precincts." 2-ER-117.

- "Election winners are determined by the data produced by computerized ballot scanners, into which the paper ballots are fed." 2-ER-118.

- "When you fill out your paper ballot and you walk over to the tabulator, you don't know what's happening in the black box and you never will know." 3-ER-538 (218:2-5).

Plaintiffs repeatedly acknowledged that Arizona uses paper ballots. The District Court, however, cited the MPI as a reason to *impose* sanctions, relying not on any express statement but rather on an inference of what the MPI was "implying," without mentioning the language in the MPI that expressly acknowledged paper ballots. 1-ER-40. The District Court's construction was based on introductory language that was at most ambiguous advocacy contrasting a "computerized voting system" (counting and tabulating votes by electronic machines) with "return to the tried-and-true paper ballots of the past" (counting and tabulating votes by humans). Any ambiguity was clarified in the MPI's express acknowledgements that Arizona uses paper ballots.

In the District Court's construction, the MPI falsely stated that Arizona does not use paper ballots even though the MPI expressly stated Arizona does use paper ballots. The District Court's construction was an abuse of discretion.

**The Paper Ballot Issue Has No Meaningful Relation to the Claims**

**Asserted as a Whole.** Citing the factor of "the relation of the unsupported portion of the complaint to the pleading as a whole" from *Townsend*, 929 F.2d at 1363-65, the District Court held that the paper ballot issue "played a central role in the purported basis for Plaintiffs' claims." 1-ER-41. This conclusion was unfounded. Because the Amended Complaint acknowledged, presumed, and required that Arizona uses paper ballots, Plaintiffs' claims had no dependence on Arizona purportedly not using paper ballots. They concerned Arizona's use of machines to count the paper ballots. 2-ER-260 (¶ 2); *see also* 2-ER-264-266, 298 (¶¶ 14, 23, 33, 155).

The District Court's paper ballot conclusion read into the Amended Complaint and the MPI, based on implication, a statement they did not make, that was contrary to many other statements actually made in these papers and elsewhere. The District Court abused its discretion by discerning a false allegation that does not exist.

### d. The District Court Wrongly Held the Allegations Concerning Testing of Arizona's Electronic Voting System Were False.

The District Court's fourth stated basis for imposing Rule 11 sanctions was its construction of the Amended Complaint as purportedly falsely alleging that Arizona's EVS was not subjected to objective, neutral, and expert evaluation. 1-ER-42. The District Court construed these statements as false because "Arizona's

equipment undergoes thorough testing by independent, neutral experts with the Secretary of State's Certification Committee and a testing laboratory accredited by the Election Assistance Commission." *Id*. There are three legal errors in the District Court's conclusion.

First, the District Court had no proper basis upon which to make a determination of fact contrary to the allegations in question. No discovery occurred in this case, and there was no evidentiary hearing related to this issue other than the truncated MPI proceeding. The District Court had no factual record upon which to base a conclusion that the testing of Arizona's electronic voting machines is so impeccable that denying the efficacy of the testing is making a false assertion.

Second, Plaintiffs presented expert testimony that, the District Court admitted, criticized the "sufficiency and reliability of those [testing and certification] processes." 1-ER-43 (n.8). This evidence made the objectivity, neutrality, and expertise of Arizona's testing and certification process a genuinely disputed fact. It is not a sanctionable false statement to allege as fact a matter that is genuinely disputed.

Third, Rule 11(b)(3) mandates only that a pleaded fact have "evidentiary support." The statements at issue have evidentiary support. Plaintiffs' denials of the objectivity, neutrality, and expertise of the testing and certification process were

58

based in part on the testimony of experienced professionals intimately familiar with issues of cybersecurity, including an individual who formerly provided cybersecurity testing for the purposes of certifying EVS under federal and state standards. *See* 1-ER-43; 3-ER-435-438, 446-447.

Rule 11(b)(3) does not require that a factual allegation be undisputed, nor that it be consistent with the official position of Arizona or the federal government, nor that it be the only inference supported by evidence. As the D.C. Circuit explained,

> If an attorney has evidence that a man 'walked into a room with a wet umbrella' at a certain time, the attorney does have 'evidentiary support' for the 'factual contention' that 'it was raining' at that time. He may not have proof by a preponderance, but he certainly has 'support.' Accordingly, a lawyer does not violate Rule 11 by saying so.

*Lucas v. Duncan*, 574 F.3d 772, 778-79 (D.C. Cir. 2009) (internal citation omitted). *See also Uy v. Bronx Mun. Hosp. Ctr.*, 182 F.3d 152, 156 (2d Cir. 1999) ("Dr. Uy's allegations did have 'evidentiary support,' consisting of at least his own testimony . . . . Rule 11 was therefore satisfied. The rule does not require the attorney to ascertain that the plaintiff's contentions will be conceded by the defendants' witnesses."); *Lexington Ins. Co. v. Scott Homes Multifamily, Inc.*, no. CV-12-02119-PHX-JAT, 2015 U.S. Dist. LEXIS 21205, *75-76 (D. Ariz. Feb. 23, 2015) ("Rule 11's factual inquiry requirement is satisfied if there is '*any* factual basis for [an]

allegation,'" and "Even weak circumstantial evidence insufficient to withstand summary judgment is sufficient to establish a factual basis sufficient to withstand Rule 11") (citing *Brubaker v. City of Richmond*, 943 F.2d 1363, 1377 (4th Cir. 1991) and *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1472 (9th Cir. 1987)). Because the Amended Complaint's factual contentions concerning the neutrality, objectivity, and expertise of Arizona's certification process had evidentiary support, they satisfied Rule 11(b)(3). *Lucas*, 574 F.3d at 780 ("evidentiary support" is "all the rule requires").

The District Court's conclusion that appellant Attorneys violated Rule 11 with reference to the objectivity, neutrality, and expertise of the testing and certification process for Arizona's EVS was based on an erroneous view of the law and lacked a factual basis.

## B. No Basis Exists to Impose Sanctions Under 28 U.S.C. § 1927.

The District Court's final basis for imposing sanctions was an assertion that appellant Attorneys violated 28 U.S.C. § 1927 by acting "recklessly or in bad faith" by bringing the MPI. 1-ER-55-56.

Section 1927 does not apply to initial pleadings. *Moore v. Keegan Mgmt. Co.*, 78 F.3d 431, 435 (9th Cir. 1996). For § 1927 sanctions to apply a filing must be made in subjective bad faith. *Id*. at 436. This means it must be either intended to harass, or reckless *and* frivolous. *Id*.  The District Court did not find intent to harass.

1-ER-55-56. Rather, it held that the MPI was frivolous and reckless. *Id*.

As shown above, Plaintiffs' claims were not frivolous or false. The District Court additionally asserted, based on *Purcell v. Gonzalez*, 549 U.S. 1 (2006), that Plaintiffs acted improperly by filing the MPI less than four months prior to the 2022 election. 1-ER-56. However, Plaintiffs had substantial arguments that *Purcell* did not preclude the MPI. Consideration of the public interest in preserving existing elections laws close to election "need not be 'controlling' and does not supervene other relevant legal considerations applicable when reviewing the grant or denial of preliminary relief." *Mi Familia Vota*, 977 F.3d at 953. *Purcell* will "often" but "not always" preclude injunctive relief when an election is "imminent," and some types of "election-related disputes" are not precluded by *Purcell*, such as disputes over poll hours or ballot casting rules. *Ohio Republican Party v. Brunner*, 544 F.3d 711, 718 (6th Cir. 2008). One of the defendants here conceded that state election rules, in some cases, may be so "constitutionally problematic" that federal court intervention is necessary "even shortly before an election." 2-ER-127 n.5.

Plaintiffs sought injunctive relief concerning the manner of counting ballots, a matter that would not have any direct effect on voters. The "concerns that troubled the Supreme Court in *Purcell* are not present" where voters "will be entirely unaffected by an order enjoining" the disputed practice because it "applies only after

a ballot is submitted." *Self Advocacy Sol. N.D. v. Jaeger*, 464 F. Supp. 3d 1039, 1055 (D.N.D. 2020)*; Common Cause Ind. v. Lawson*, no. 1:20-cv-01825-RLY-TAB, 2020 U.S. Dist. LEXIS 247756, \*13 (S.D. Ind. Oct. 9, 2020) ("[T]he concerns animating *Purcell* and its progeny are not present in this case. . . .The laws only pertain to Election Day activities . . .").

Plaintiffs had a good-faith basis, supported by case law, to argue that *Purcell* did not preclude the MPI. Moreover, the MPI sought preliminary relief applicable to all future elections, not limited to the 2022 election. If the District Court decided relief should not be granted prior to the 2022 election, it could still have granted an injunction applicable only to successive elections. The District Court was not persuaded by Plaintiffs' arguments in support of the MPI, but the arguments were not frivolous.

The District Court's finding of recklessness was also without basis. The only evidence of recklessness identified by the District Court was a delay of "nearly seven weeks" in the filing of the MPI, the purported frivolousness of the claims, and *Purcell*. 1-ER-55-56. None of these support the District Court's recklessness conclusion.

Plaintiffs' delay in bringing the MPI is evidence of the *lack* of recklessness by appellant Attorneys. They took the time necessary to gather numerous detailed

declarations, with lengthy exhibits, from expert witnesses whose testimony supported the request for injunctive relief, and to draft thorough motion papers. *See* 2-ER-200-258, 3-ER-588-589, 2-ER-162-197. That is the opposite of reckless.

The MPI was not frivolous, as explained above.

Appellant Attorneys evaluated *Purcell* and concluded that their request for injunctive relief concerning the 2022 election was proper if brought in June 2022, but the request would not work if brought in September 2022. Both conclusions were reasonable. Appellant Attorneys were well aware of the *Purcell* issue and addressed it in the MPI. 2-ER-195-197.

The District Court's conclusions that the Attorneys acted recklessly or in bad faith, and that they improperly multiplied proceedings under 28 U.S.C. § 1927, had no basis and were an abuse of discretion.

## VII. CONCLUSION

A critical function of the federal courts is to provide a mechanism for frustrated citizens to dispute the constitutionality of government practices. It is dangerous and improper for federal courts to impose punitive sanctions on those who seek to make use of this function – particularly where other persons have brought similar claims without being sanctioned, as in *Curling* – and it is dangerous and

improper to functionally immunize state government practices against challenge in federal court by sanctioning attorneys who bring a challenge with support.

The District Court's Sanctions Order should be reversed in total. Plaintiffs have a right to challenge the Arizona EVS in court, even if the District Court disagrees with their assessment of the security of the system.

## VIII.  STATEMENT OF RELATED CASES

No. 22-16413 and No. 23-16023 in this Court are related cases.


Respectfully submitted,


DATED: October 27, 2023       **PARKER DANIELS KIBORT LLC**

By */s/ Andrew D. Parker*
    Andrew D. Parker (AZ Bar No. 028314)
    888 Colwell Building
    123 N. Third Street
    Minneapolis, MN 55401
    Telephone: (612) 355-4100
    Facsimile: (612) 355-4101
    parker@parkerdk.com

**OLSEN LAW, P.C.**
By */s/ Kurt Olsen*
    Kurt Olsen (D.C. Bar No. 445279)
    1250 Connecticut Ave., NW, Suite 700
    Washington, DC 20036
    Telephone: (202) 408-7025
    ko@olsenlawpc.com

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)** 23-16022

I am the attorney or self-represented party.

**This brief contains** 13,851 **words,** including [ ] words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

⦿ complies with the word limit of Cir. R. 32-1.

◯ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

◯ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

◯ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

◯ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

◯ complies with the length limit designated by court order dated [ ].

◯ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Andrew D. Parker **Date** 10.27.2023

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8** *Rev. 12/01/22*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 27, 2023, I filed the foregoing Appellants' Brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Andrew D. Parker*
Andrew D. Parker